[Civ. No. 48132. Second Dist., Div. Four. May 3, 1977.]

MICHAEL J. FISHER, Plaintiff and Appellant, v.
PENNSYLVANIA LIFE COMPANY et al.,
Defendants and Respondents.

**COUNSEL**

Hecht & Diamond, Roger Jon Diamond and Wayne G. Hawley for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Theodore B. Olson, Aulana L. Peters, Wyman, Bautzer, Rothman & Kuchel, Terry Christensen and Andrew M. White for Defendants and Respondents.

**OPINION**

**KINGSLEY, J.**—Plaintiff appeals from an order dismissing his second amended complaint, after an order sustaining, without leave to amend, a demurrer to that complaint.

For the reasons set forth below, we reverse the order.

I

The case involves the rights of plaintiff and defendants with reference to an agreement entered into between them "as of November 29, 1971." Although a copy of that agreement was incorporated (as exhibit A) in the original complaint it is not so incorporated in the second amended complaint. Nevertheless, since the latest pleading does not attempt to avoid the original allegation, the trial court, and the parties here, have treated the case as one in which the interpretation and validity of that agreement was in issue.

## II

Accepting, as we must in the procedural status of the case, the truth of the factual allegations of the second amended complaint, the case presents the following picture.

In 1968, plaintiff (and his assignor Shrotman) sold two businesses to defendant Pennsylvania Life Company (Penn Life). As consideration, they received 3,000 "restricted"[1] shares of Penn Life stock and were to receive, at a later date, out of an escrow, an additional 15,000 shares of such "restricted" stock. By reason of subsequent stock splits, the 15,000 shares in escrow increased to approximately 50,000 shares. In violation of the 1968 agreement, Penn Life failed to secure the release of the 3,000 shares from their "restricted" status and failed to distribute the escrow shares in accordance with the term of the 1968 agreement. After plaintiff had threatened suit and after negotiations in which plaintiff was represented by counsel, the parties entered into the 1971 agreement. Under it, the first 3,000 shares (by then 20,000 shares as a result of the stock splits) were released from restriction and plaintiff received an additional 3,300 shares free of restriction. In consideration of receiving the 23,300 shares of Penn Life stock, plaintiff released his claims under the 1968 agreement.[2]

Pertinent to the present action are two paragraphs of the 1971 agreement, reading as follows:

"6. Except for the covenants contained in paragraph 4 above, for valuable consideration, receipt of which is hereby acknowledged, Fisher and Shrotman, and each of them, hereby release and discharge the Pennsylvania Companies, and each of them, and their parents, affiliates, subsidiaries, officers, directors, stockholders, employees, agents, representatives, heirs, executors, administrators, successors and assigns from any and all liabilities, claims, demands, obligations, cause or causes of action whatsoever including, but not limited to, any matters in any way connected or related to said written Exchange Agreement and Plan of Reorganization or any writing or oral agreements or representations

---

[1]The pleading does not allege the technical significance of the term "restricted." The parties have briefed the case on the assumption that "restricted" stock was not freely transferable. In the view we take of the case no further pleading as to the meaning of the term is material.

[2]In the original complaint, plaintiff attacked the 1968 agreement as fraudulently induced. That contention was dropped in the second amended complaint and no issue as to the validity or effectiveness of the 1968 agreement is now before us.

made in connection therewith, and arising out of or related to any other matters, happenings or events occurring prior to the execution of this Agreement, whether or not said claims are now known or unknown (Fisher and Shrotman, and each of them, are expressly contracting as to unknown claims), and Fisher and Shrotman, and each of them, hereby waive the provisions of Section 1542 of the California Civil Code, and any other similar law of any jurisdiction other than California, which Section provides as follows:

" 'A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing a release, which if known by him must have materially affected his settlement with the debtor.'

"13. Fisher and Shrotman, and each of them, hereby acknowledge that neither Fisher nor Shrotman, nor either of them, has made and entered into this Agreement in reliance upon any warranty or representation by any person or entity whatever except for warranties or representations specifically set forth herein. No supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the party to be bound. No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether similar in nature or not), nor shall such waiver constitute a continuing waiver unless otherwise specifically expressed in writing by the party deemed to have made such waiver."

In support of his claim that the 1971 agreement was entered into because of fraud on the part of Penn Life and of the individual defendants who were officers of Penn Life,[3] plaintiff relies on certain allegedly false statements made during the negotiations leading up to the execution of the 1971 agreement and on an allegedly fraudulent concealment of a material fact.

## II

The allegedly false representations were in essence: (a) that the individual defendants were engaged in purchasing, for their own account, substantial amounts of Penn Life stock, whereas, in fact, they were selling substantial amounts of that stock; and (b) representations by the individual defendants, based on their "insider" knowledge, that Penn

---

[3] It is alleged that the individual defendants were acting both on their own behalf and as agents of Penn Life.

Life stock would increase in market value in the future, whereas those defendants knew that the stock would decrease in market value in the future.

Plaintiff alleges that, although the stock received by him under the 1971 agreement had, as of the date of that agreement, a market value of approximately $800,000, in fact, by 1973, as a result of matters then known to defendants, the stock had decreased in value to approximately $62,000.

■ Plaintiff here relies on cases that hold that, where an agreement is obtained by fraud, it may be rescinded in spite of provisions therein purporting to waive fraud. But those cases are inapposite to this case. Here, plaintiff had agreed that he (and Shrotman) had entered into the 1971 agreement in reliance *only* on the representations set forth in that agreement. Such an agreement amounts to a statement, now binding on plaintiff, that any other representations previously made to him were not material inducements to his execution of the 1971 agreement. Since he thus, in 1971, agreed that he had not relied on the representations on which he now seeks recovery, he cannot now claim otherwise. (*Casey* v. *Proctor* (1963) 59 Cal.2d 97 [28 Cal.Rptr. 307, 378 P.2d 579]; *Kronsberg* v. *Milton J. Wershow Co.* (1965) 238 Cal.App.2d 170 [47 Cal.Rptr. 592].)

### III

■ It follows that, if plaintiff has stated any cause of action against defendants, it is his allegation that the 1971 agreement was the result of a fraudulent concealment of facts, known to defendants and unknown to plaintiff. The fact so concealed is alleged to be that, for some time prior to the 1971 agreement, defendants had been parties to fraudulent transactions with another company, known as Equity Funding Corporation of America, the result of which had been artificially to increase the market value of Penn Life stock far beyond its actual value. Plaintiff alleges that, in 1973, the so-called "EFCA/PLC" fraud became known to the investing public, resulting in the substantial decrease in the market value of Penn Life stock above referred to.[4]

[4]As defendants point out, the pleading is silent as to the nature of the so-called "EFCA/PLC" fraud. Were it material, that omission could have been cured by amendment. However, in the view we take of the case, the details of the so-called fraud are not material to a disposition of the appeal.

Plaintiff argues that he has alleged facts which give rise to a "limited fiduciary duty" owed by defendants. Plaintiff argues that this limited fiduciary duty is the duty owed by corporate insiders to the shareholders of the corporation in the matter of sales of stock, where there are special facts which make it inequitable for them to withhold information (*Low* v. *Wheeler* (1962) 207 Cal.App.2d 477, 484 [24 Cal.Rptr. 538]), and defendants' liability arises from this breach of fiduciary duty. (*Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412 [159 P.2d 958]; *Taylor* v. *Wright* (1945) 69 Cal.App.2d 371 [159 P.2d 980]; *American T. Co.* v. *California etc. Ins. Co.*, 15 Cal.2d 42 [98 P.2d 497].)[5] We agree that plaintiffs have alleged a breach of a fiduciary duty to plaintiff, and the demurrer should not have been sustained.

California has expanded the special facts doctrine of the *Hobart* case (1 Ballantine & Sterling, Cal. Corporation Laws (4th ed.) § 102.03) and now follows a broader rule. The present law in California is set forth in *Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93 [81 Cal.Rptr. 592, 460 P.2d 464]. ▮ Although the *Jones* case dealt specifically with conduct of a controlling shareholder, rather than a director, the *Jones* court said that the rule of "good faith and inherent fairness" to minority shareholders applies to officers, directors, and controlling shareholders who seek to gain an advantage in the sale or transfer of their controlling block of shares. (1 Cal.3d 93, at p. 110.)

Respondents argue that any rules relating to fiduciary duty of directors to minority shareholders applies only to closely held corporations. In the *Jones* case the Supreme Court did reason that traditional theories of fiduciary duty have failed to offer protection to minority shareholders and "particularly to those in closely held corporations whose disadvantageous and often precarious position renders them particularly vulnerable to the vagaries of the majority." (1 Cal.3d at pp. 100, 111.) Although the

---

[5]The California Supreme Court in *American T. Co.* v. *California etc. Ins. Co.* (1940) 15 Cal.2d 42 [98 P.2d 497], has stated the following circumstances should be considered in determining whether special facts exist: (1) the number of shareholders in the corporation; (2) whether or not a sale of all or almost all corporate stock appeared likely in the immediate future; (3) whether or not the sale of stock involved a misuse of corporate office or a breach of duties owing to the corporation by the officers, directors, or controlling shareholders in question; (4) whether or not there was partial disclosure of relevant facts by the officers, directors, or controlling shareholders which disclosure was not the whole truth; (5) whether or not the corporation possessed a unique asset and whether or not a principal objective of the purchaser of the corporate stock was to acquire that asset; and (6) any other acts by the officers, directors, or controlling shareholders in question which tended to depreciate the value of the minority stock. The existence of special facts will then impose upon the officer, director, or controlling shareholder a fiduciary duty to the minority shareholders.

Supreme Court dicta in *Jones* does reflect a particular concern for minority shareholders in closely held corporations, nothing in that dicta also suggests that the Supreme Court would limit the rule of "inherent fairness to the minority" only to those cases involving closely held corporations. We do not read any language in the *Jones* case as granting a license either to majority shareholders or to corporate directors to exercise bad faith with minority shareholders in corporations that are not closely held.

In the case at bench, the allegations show that defendant directors chose a course of action in which they used their control of the company to obtain an advantage not available to all stockholders, without regard to the detriment to plaintiff and without a compelling business purpose for their conduct. Such conduct by defendants is inconsistent with their duty of good faith and inherent fairness to minority stockholders. Directors, and controlling shareholders "may not use their power to control the corporation for the purpose of promoting a marketing scheme that benefits themselves alone to the detriment of the minority." (1 Cal.3d 93, at p. 115.) The fact that defendants engaged in transactions with Equity Funding designed artificially to inflate the price of Penn Life stock is a fact which makes it inequitable for defendants to enter into the kind of transaction which they made with plaintiff in 1971. A person who is asked to give Penn Life the kind of comprehensive exculpatory clause that was contained in the 1971 contract legitimately would want to know about this artificial inflation in the price of the Penn Life stock and the probability that that price eventually would collapse when the manipulation became known. Under the theory of fiduciary duty owed by directors and majority stockholders expressed in *Jones,* we find that plaintiff has alleged a breach of that duty in the complaint before us.

The judgment (order of dismissal) is reversed.

Files, P. J., and Jefferson (Bernard), J., concurred.