OAK INDUSTRIES, INC., and Oak Technology, Inc., Plaintiffs,

v.

The FOXBORO COMPANY, Defendant.

Civ. No. 83–1068–E(I).

United States District Court, S.D. California.

Aug. 10, 1984.

Lance B. Wickman, Latham & Watkins, San Diego, Cal., for plaintiffs.

Sally A. VanderWeele, Goodwin, Procter & Hoar, Boston, Mass., for defendant.

## MEMORANDUM DECISION

ENRIGHT, District Judge.

### BACKGROUND

This case involves a dispute between the purchasers of a corporation, plaintiffs Oak Industries, Inc. and its subsidiary, Oak Technology, Inc. (hereinafter collectively referred to as "Oak Industries"), and the seller of that corporation, defendant Foxboro Company. The corporation which changed hands is Adec, Inc., called Foxboro/Adec, Inc. prior to the sale and now known as Oak/Adec, Inc. The sale took place on June 13, 1980 and was consummated via a stock purchase agreement in which Oak Industries provided as consideration for the acquisition of 100% of the Adec stock shares of Oak stock valued at $4.2 million.

Adec, both before and after the sale, has been a company engaged in the development of management programs through which various organizations can improve the efficiency of their energy consumption, primarily through the use of computer software. Both plaintiffs and defendant, purchaser and seller, are sophisticated publicly-held corporations with stock traded on the New York Stock Exchange. The purchaser, Oak Industries, was not well-versed in the type of business in which Adec was engaged prior to the sale, however, although Oak utilized the services of its employees who were highly trained electrical engineers in evaluating the purchase of Adec.

The background of the sale is as follows. In October of 1979, Foxboro Company made a determination to sell its wholly-owned Adec subsidiary and executed a "Selling Plan Agreement" with Adec's key employees, the terms of which provided that each key employee was to devote his best efforts towards consummating the sale and easing the transition to the new owners. In return for such efforts, the participating employees were to receive a percentage of a fund containing several hundred thousand dollars. The investment firm of Paine, Webber, Jackson and Curtis was enlisted to assist in locating a buyer for the company, and Paine, Webber prepared an offering brochure describing the company which was circulated in October 1979.

After examining the offering brochure, plaintiff Oak, seeking to expand into new technologies, executed a letter of intent to purchase Adec from Foxboro on January 29, 1980. The letter of intent expressly conditioned the acquisition of Adec on Oak's successful negotiation of an employment agreement with Foxboro/Adec employee James LaBarber, the primary member of the "key employee" group mentioned above. The letter also stated Oak's intention to retain other Adec executives and employees. Finally, on June 5, 1980, the "Stock Purchase Agreement" was executed which set forth in detailed fashion the rights and duties of all parties to the transaction.

The crux of the present dispute is whether or not certain representations or omissions allegedly made by Foxboro to Oak in the sale of Adec constitute actionable fraud under either federal or state securities or common law. Specifically, Oak alleges that the key asset of Adec was a computer based energy management and conservation system, the "9000 System," that was to have been designed by Adec prior to the sale with contracts for Adec to provide that system to numerous institutional purchasers already in place. Oak alleges that in order to consummate the sale, Adec fraudulently represented that this "9000 System" was functional or near-functional, and "demonstrated" this to Oak agents through a phony computer display which appeared operational but in fact was not. The key employee, LaBarber, who continued as an Adec employee after the sale, allegedly continued to perpetrate this fraud on Oak for a substantial period afterwards.

In response to this alleged fraud, Oak Industries filed the present lawsuit alleging violation of the federal and state securities laws (Counts I through IV) as well as several common law claims (Counts V through VIII). As an alternative remedy, Oak seeks to rescind the contract and receive restitutionary damages (Count IX). Defendant Foxboro has counterclaimed seeking a declaratory judgment enforcing the contractual provisions which require Oak to substitute itself in the place of Foxboro as guarantor or obligor on a number of bonds. Defendant Foxboro presently moves this court for summary judgment in its favor as to all claims against it and as to its counterclaim against Oak.

## DISCUSSION

### I.

### PLAINTIFFS' FEDERAL SECURITIES CLAIMS

In Count I of their complaint, plaintiffs contend that the actions of defendant constitute a fraud in connection with the pur-

chase of Adec stock by Oak in violation of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), and Rule 10b–5 promulgated thereunder. Similarly, Count II raises the same allegation as to the sale of Oak stock to Foxboro which occurred when the Oak stock was provided as consideration for the Adec stock.

Defendant is entitled to summary judgment in its favor as to these two counts. In *Landreth Timber Co. v. Landreth*, 731 F.2d 1348 (9th Cir.1984), the Ninth Circuit adopted the view that the "sale of business" doctrine is the law of this circuit. That doctrine, when applied to the present facts, is dispositive of the federal securities claims.

■ The "sale of business" doctrine recognizes that the purpose of the federal securities laws is to protect the passive investor who invests in a common enterprise with the profits to come from the efforts of others. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). As a result, a distinction is drawn between securities transactions in which the investor expects to profit "solely from the efforts of others" and those in which a purchaser of stock assumes control of a company and hopes to realize profits as the fruit of his own labors. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946); *Landreth Timber Co.*, 731 F.2d at 1351. The former falls within the definition of "securities" for purposes of federal law according to the sale of business doctrine, while the latter does not. *Id.* at 1350.

The sale of business doctrine has been accepted by the Seventh, Tenth, and Eleventh Circuit Courts of Appeal and rejected by the Second, Third, Fourth, Fifth, and Eighth Circuits. *Landreth Timber Co.*, 731 F.2d at 1351.[1] As noted, in *Landreth*, the Ninth Circuit explicitly adopts this doctrine with regard to the case there presented, and held that the " 'sale-of-business' exclusion from the Securities acts [applies to] the purchase of 100 per cent of the stock of a closely-held corporation." *Id.* at 1353.

■ Since the transaction at issue in the present case consisted of the transfer of 100% of Adec's stock from Foxboro to Oak as a mechanism of transfer of ownership of Adec from Foxboro to Oak, this was a sale of business within *Landreth*. No violation of the federal securities law can be established as a matter of law because the object transferred was a business, not a group of "securities."

Plaintiff asserts that *Landreth* is inapposite, however, arguing that because plaintiff retained key management personnel from Foxboro Company, this is a case where profits were expected to be obtained "from the managerial and entrepreneurial efforts of others," *SEC v. W.J. Howey Co.*, 328 U.S. at 301, 66 S.Ct. at 1104, and thus a passive investment within the ambit of the federal securities laws.

This contention cannot prevail. *Landreth* itself dealt with a case where Landreth, the seller, was retained by the purchaser under a one-year consulting agreement. As is argued in the present case, none of the members of the purchasing group in *Landreth* had any knowledge of the industry into which they were entering and the success of the business was overestimated in the seller's representations to the purchaser. Nonetheless, the court held that no recovery could be had under federal securities provisions and the court gave short shrift to the contention that the consulting services of the seller or the services

---

1. This court recognizes that certiorari has been granted by the United States Supreme Court to resolve the issue of whether the sale of business doctrine is a valid exception to the anti-fraud provisions of the federal securities laws. *See Seagrave Corp. v. Vista Resources, Inc.*, 696 F.2d 227 (1982), *modified* 710 F.2d 95 (2d Cir.1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 1412, 79 L.Ed.2d 738 (1984) (S.Ct. Docket No. 83–1084). Plaintiffs have not argued that the present uncertainty warrants a stay of resolution of the present motion, merely that it warrants denial. Regardless, this court is not inclined to stay the proceedings pending outcome of the above-cited case and is currently bound by Ninth Circuit precedent as set forth in *Landreth*.

of a manager hired by plaintiff constituted the type of third-party management which would transform the sale into a passive investment: "Neither Landreth nor appellant's manager can be regarded as a third-party upon whose efforts the purchaser relied for its profit within the meaning of *Howey. Bitter v. Hoby's International, Inc.*, 498 F.2d 183, 186 (9th Cir.1974)." *Landreth*, 731 F.2d at 1353.

While the present case may be somewhat stronger than *Landreth* in that here the agents of the former owner remained with the company as *managers*, rather than consultants, this court does not find that distinction persuasive. The *Bitter* case, cited by the Ninth Circuit in *Landreth* states:

> For a manager to be a "third person" within the meaning of the *Howey* test, the manager must be outside of the direct and immediate control of the franchisee.

*Bitter v. Hoby's International, Inc.*, 498 F.2d 183, 186 (9th Cir.1974). On the present facts, plaintiffs cannot seriously contend that the managers they utilized were outside of their control. While it is undisputed that these managers were employees of Foxboro prior to the sale of Adec to Oak, at the time the sale was consummated they became employees of Oak. This fact is made clear by plaintiffs' own affidavits in support of its opposition to the motion.

In the affidavit of Bissell J. Smith, Senior Vice President of Oak Industries, Inc., Smith states that "Mr. LaBarber remained in place as Adec's general manager after Adec was acquired by Oak and was Adec's spokesperson *in reporting to Oak*." (emphasis added). Further, he states "[i]n or about November 1981, Mr. LaBarber began providing me with general reports about Adec...." And, "[a]fter overseeing Adec for a period of two or three months, it became apparent to me that the projections and generally positive results reported by Mr. LaBarber were not being confirmed by Oak Adec's financial data...." Finally, "[i]n the spring of 1982, I [Smith] approached Oak's senior management and re-ported my problems in obtaining complete reports on Adec and recommended that Mr. LaBarber be terminated. Oak management accepted this recommendation and Mr. LaBarber was terminated in or about May, 1982."

Clearly Oak, not Foxboro nor any other third party, controlled the operation and management personnel of the company it had purchased, and this case is not one within the third party control line, but rather it falls squarely within the sale of business doctrine. As such, plaintiffs' causes of action based on federal securities law must fail.

Plaintiffs have argued as a further theory that even if Count I, alleging fraud in the *purchase* of Adec stock by Oak, is within the sale of business rule, that Count II should still stand because that count alleges fraud in the *sale* of Oak Industries stock to Foxboro. That sale occurred when Oak stock was exchanged for 100% of the Adec shares and plaintiffs' theory is that since there are no cases which apply the sale of business doctrine to the sale of stock, this sale of Oak shares falls within the umbrella of federal securities law notwithstanding the fact that consideration for the sale was the receipt of all extant Adec shares.

This creative logic is unpersuasive. The purchase and sale of stock in this context are but flip sides of the same coin; regardless of the characterization, the transaction is a sale of a business. The *Landreth* opinion makes clear that it is the "economic reality" of the transaction that controls. 731 F.2d at 1352; *see also United Housing Foundation, Inc.*, 421 U.S. at 849, 95 S.Ct. at 2059. The probable reason for the dearth of opinions holding that the *sale* of securities pursuant to a sale of business falls within that doctrine is that most sales of businesses would involve the *purchase* of the stock by the party who is ultimately complaining of the transaction. In other words, in these situations, unless, as here, stock is exchanged as consideration on both sides, the plaintiff will be alleging fraud in the *purchase* by it of securities.

That this case involves an exchange of securities of two companies as the consideration for the contract does not alter the applicability of the sale of business rule. Thus, summary judgment in favor of defendant must be granted as to Count II of plaintiffs' complaint as well.

## II.

### STATE SECURITIES LAW CLAIMS

Counts III and IV of plaintiffs' complaint seek relief under provisions of state law comparable to the federal law provisions discussed above. For the reasons that the federal claims cannot prevail, neither can the state law ones.

California securities law was patterned after federal law and the federal constructions are useful in construing state law. *People v. Schock*, 152 Cal.App.3d 379, 387, 199 Cal.Rptr. 327 (1984). This plaintiffs concede. *Memorandum in Opposition*, at 19. Plaintiffs base their opposition, rather, on the already-addressed contention that the sale of business doctrine does not apply to the federal claims. But, as discussed, federal law in this circuit applies the sale of business doctrine, thus indicating, by the state court's adoption of federal precedent as instructive, that the doctrine governs at the state level as well.

State decisional law, while it has not addressed the precise point in issue here, also indicates that the sale of business doctrine controls. The California courts reject the literalist approach to the definition of a "security" and instead look to the economic reality of the transaction as embodied in the "risk capital" test. *People v. Schock*, 152 Cal.App.3d at 385–86, 199 Cal.Rptr. 327. More importantly, the California courts have specifically adopted the sale of business doctrine in applying other securities laws provisions. *Fox v. Ehrmantraut*, 28 Cal.3d 127, 138, 167 Cal.Rptr. 595, 615 P.2d 1383 (1980). The California Supreme Court has implied that the adoption of this doctrine would extend to the entire California securities act. *Id.* at 138, 167 Cal.Rptr. 595, 615 P.2d 1383.

In light of the foregoing, the court concludes that summary judgment should be entered in favor of defendant as to Counts III and IV of plaintiffs' complaint.

## III.

### COMMON LAW CLAIMS

Counts V through IX allege various common law claims against defendant: Count V alleges fraud and deceit; Count VI alleges negligent misrepresentation; Count VII alleges breach of contract; Count VIII alleges breach of the implied covenant of good faith and fair dealing; and Count IX seeks an alternative remedy of rescission and restitution based upon the misrepresentations alleged to have been made.

It is defendant's contention that defendant is entitled to summary judgment as to all the listed counts. In order to resolve this issue, however, a preliminary examination must be made of the parol evidence rule.

Several provisions of the contract are relevant to this inquiry. First, in Section Two of the contract, defendant makes certain warranties. One such warranty is contained in Section 2.7 and relates to the financial data which Foxboro provided to Oak prior to the signing of the agreement. It provides:

> Said financial statements have been prepared in accordance with the accounting principles, practices and methods employed by [Foxboro] in the preparation of its consolidated financial statements, and present fairly the financial condition of Adec at the dates of said statements and the results of its operations for the periods covered thereby.

Section 2.9 relates to the same financial accounting and provides in part:

> There is no fact known to [Foxboro] or Adec which materially adversely affects or may in the future (so far as can now be reasonably foreseen) materially adversely affect, the business, properties, operations or condition of Adec which has not been disclosed herein or in a Schedule furnished herewith.

Section 10 of the contract contains the general provisions and Section 10.8 provides:

> It is agreed by the parties that [Foxboro] has permitted [Oak] to conduct an audit of Adec's records and operations, the scope and duration of which audit was determined by [Oak], and that the Purchase Price reflects the fair value of Adec in light of the results of such audit. Accordingly, notwithstanding any other provision of this Agreement, it is further agreed by the parties that the Purchase Price will not be reduced following the execution of this Agreement, nor will [Foxboro] or Adec have any obligation or liability to [Oak], relative to the financial statements of Adec furnished pursuant to Section 2.7 or any alleged breach of representation or warranty in connection therewith.

Finally, Section 10.4 provides:

> *Entire Agreement.* This Agreement, including the Schedules referred to herein, is complete; and all promises, representations, understandings, warranties and agreements with reference to the subject matter hereof, and all inducements to the making of this Agreement relied upon by all the parties hereto, have been expressed herein or in said Schedules.

Based upon these contract provisions, defendant argues that plaintiffs cannot prove that there were misrepresentations made by Adec personnel or in the offering brochure. First, defendant contends that the contractual disclaimer of any representations, warranties, or inducements not stated in the contract precludes the claim based on any representations not contained in the agreement itself. Second, defendant argues that because the contract provides that all inducements are stated in the contract, any other alleged misrepresentation fails because there can be no showing of the requisite element of materiality. In addition, defendant argues that plaintiff's breach of contract claims are barred by the provision of Section 10.8 purporting to release defendant from any liability relative to the financial statements. Because any proof to the contrary would vary the terms of the integrated written agreement, defendant concludes, parol evidence is inadmissible to alter these terms as contained within the four corners of the document.

Plaintiffs' view, not surprisingly, is quite different. Plaintiffs rely on the claim of fraud in the inducement and point out that parol evidence is always admissible to show fraud in the inducement to enter into the contract. Thus, plaintiffs conclude, despite language in the contract which would suggest that the contract is an integrated one and that all inducements to the contract are stated, these provisions fall with the rest of the contract in the face of fraud which plaintiffs are entitled to prove.

■ Both sides of the dispute are correct to a point. It is hornbook law that the parol evidence rule forbids introduction of evidence which would add to, contradict, or vary the terms of a written agreement. *See, e.g., Pascoe v. Morrison,* 219 Cal. 54, 56, 25 P.2d 9 (1933); *Alameda County Title Ins. v. Panella,* 218 Cal. 510, 516, 24 P.2d 163 (1933). An exception to the rule exists, however, in the case of fraud. Extrinsic evidence is generally admissible to prove fraud in the inducement of the instrument. *Fleury v. Ramacciotti,* 8 Cal.2d 660, 662, 67 P.2d 339 (1937); *Martin v. Sugarman,* 218 Cal. 17, 18–19, 21 P.2d 428 (1933); *Mooney v. Cyriacks,* 185 Cal. 70, 71, 195 P. 222 (1921). This holds true even where the instrument itself purports to contain the entire agreement, *Partanian v. Flodine,* 95 Cal.App.2d 931, 934, 213 P.2d 790 (1950), contains a provision that no representations have been made other than those stated within the agreement, *Morris v. Harbor Boat Building Co.,* 112 Cal. App.2d 882, 887–88, 247 P.2d 589 (1952), or contains a written waiver of oral representations, *Perry v. Magee,* 116 Cal.App.2d 155, 159, 253 P.2d 488 (1953). *See also Vai v. Bank of America,* 56 Cal.2d 329, 344, 15 Cal.Rptr. 71, 364 P.2d 247 (1961). The rationale for this rule is that extrinsic evidence of fraud does not contradict or vary the terms of the written agreement; it merely shows that no binding contract was made. *Wiberg v. Barnum,* 99 Cal.App.

323, 325–26, 278 P. 871 (1929). In addition, it is frequently stated that the parol evidence rule should not be used to shield fraud. *Stewart v. Crowley,* 213 Cal. 694, 699, 3 P.2d 562 (1931); *Morris v. Harbor Boat Building Co.,* 112 Cal.App.2d at 887–88, 247 P.2d 589.

The issue becomes confused, however, because despite this general exception for fraud, there is an exception to the exception which has been developed to prevent the use of artful pleading to circumvent the restrictions of the parol evidence rule. *See generally,* J. Calamari & J. Perillo, *Contracts* § 9–19 (2d ed. 1977). This problem arises because a promise made without the intention to perform that promise can constitute a misrepresentation of fact (in that the promissor is falsely stating his intent) as well as a breach of the contract when the agreed upon performance is not made. *Id.; see also* 31 *Cal.Jur.3d* § 346 (1976). If unrestricted, this factual situation would enable a party to avoid the parol evidence rule by pleading misrepresentation rather than breach of contract and then proving through extrinsic evidence a promise that contradicts the writing. As a result:

A limitation on the exception permitting extrinsic evidence of fraud is that in actions in which the validity of the written contract or of one or more of its terms is contested, such evidence must tend to establish some independent fact, such as fraud in the procurement of the instrument or some breach of confidence concerning its use, and not a collateral promise directly at variance with the written promise. Thus, a promise of the payee of an obligation payable on demand that he would not enforce it until a certain event cannot be shown by parol. And fraud in the inducement by a false representation or by a promise made without intention of performance may be shown by parol if the representation or promise refers to some additional act not covered by the terms of the contract, but not if it is directly at variance with the terms of the instrument.

31 *Cal.Jur.3d* at § 346.

Defendant takes this rule and argues that it establishes that plaintiffs, despite their allegations of fraud in the inducement, cannot be heard to prove matters that contradict the contractual provisions, for example, that there are no other representations than those contained in the contract and that defendant's warranties are limited as set forth in the document. This court concludes that defendant misreads the nature of this exception to the fraud exception and that it must be viewed in light of its limited purpose of avoiding an undermining of the parol evidence rule by permitting every breach of contract to be pleaded as the tort of fraud.

The cases cited by defendant support this view. They deal with "promissory fraud" in which the alleged fraud is found in the giving of a promise which defendant does not intend to keep, the subsequent breach of which constitutes both breach of contract and fraud. *See, e.g., Bank of America National Trust & Savings Ass'n. v. Lamb Finance Co.,* 179 Cal.App.2d 498, 502, 3 Cal.Rptr. 877 (1960); *Dillon v. Sumner,* 153 Cal.App.2d 639, 644, 315 P.2d 84 (1957); *Cobbs v. Cobbs,* 53 Cal.App.2d 780, 785, 128 P.2d 373 (1942).

Such is not the present case. Here, plaintiffs allege that defendant represented that the "9000 System" was fully functional or nearly so and that contracts had been made the performance of which by Adec would be possible. As it turned out, according to the allegations of the complaint and the evidence submitted in opposition of this motion, the "9000 System" was neither functional nor near-functional as represented. This is a classic statement of a claim for fraud in the inducement; it is not "promissory fraud" such as would be had if, for example, defendant represented it would sell Adec to Oak for $3 million and executed a written agreement to that effect, but did not intend to do so and in fact breached the agreement. In the latter case, parol evidence would not be admissible to contradict the terms of the written agreement, such as to show that the agreed upon price was $2 million, while in

the former case, the present one, evidence is admissible to show there were fraudulent inducements to contracting.[2]

 Because parol evidence will be admissible to show fraud in the inducement, defendant's reliance solely upon the contractual language to defeat plaintiffs' causes of action for breach of contract, fraud, and breach of implied warranty cannot entitle defendant to summary judgment in its favor as to these counts.

 Defendant does not attempt to refute the allegations of fraud in the inducement with a factual showing that no such fraud existed, therefore summary judgment as to the common law counts, V through IX, is inappropriate at this juncture. In addition, defendant's motion for summary judgment in its favor as to the claim it has against plaintiff is premature until the underlying issue of the valid or fraudulent nature of the contract is resolved.

### CONCLUSION

Upon due consideration of the parties' memoranda and exhibits, the arguments advanced at the hearing, and for the reasons set forth herein, the court grants defendant's motion for summary judgment as to Counts I through IV and denies defendant's motion for summary judgment as to Counts V through IX of plaintiffs' complaint, and as to its counterclaim against plaintiffs.

---

**2.** *See Munchow v. Kraszewski,* 56 Cal.App.3d 831, 836, 128 Cal.Rptr. 762 (1976); *but see Fisher v. Pennsylvania Life Co.,* 69 Cal.App.3d 506, 511, 138 Cal.Rptr. 181 (1977).