790 F.2d 1439
 BRAE TRANSPORTATION, INC. and Brae Communication, Inc.,
Plaintiffs-Appellants,
v.
COOPERS & LYBRAND, a partnership; Luke G. Williams; Luke
G. Williams, a Trustee for the Luke G. Williams Trust;
Charles M. Williams; Donald Sherwood; Pioneer Investment
Company, Defendants-Appellees.
 No. 85-1891.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 17, 1986.
Decided June 3, 1986.
 
 William A. Brockett, Keker & Brockett, San Francisco, Cal., for plaintiffs-appellants.
 Marc P. Fairman, Morrison & Foerster, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before FARRIS and BOOCHEVER, Circuit Judges, and KEEP,* District Judge.
 FARRIS, Circuit Judge:
 
 
 1
 Brae Transportation, Inc. and Brae Communication, Inc. appeal from summary judgment granted to the Shareholders of American Sign and Indicator Corporation. After buying 85% of the stock of AS & I from the Shareholders, Brae discovered a shortfall in the warranted net worth of AS & I. Settlement of that claim included the execution of a Release Agreement whereby Brae released the Shareholders of AS&I from all claims as to net worth. After settlement, Brae discovered an allegedly improper accounting method used by AS & I which, when corrected, resulted in a further decrease in AS & I's net worth. Brae sued to recover this belatedly discovered decline. The district court granted summary judgment to the Shareholders of AS & I, holding that as a matter of law the Release barred this suit. We affirm.
 
 FACTS
 
 2
 Brae agreed to buy 85% of the stock of AS & I. The selling Shareholders represented in the Stock Purchase Agreement that AS & I's net worth would be at least $19,625,000. This figure was based on audits by Coopers & Lybrand, AS & I's regular accountants, who vouched that its audit complied with Generally Accepted Accounting Principles and Generally Accepted Auditing Standards.
 
 
 3
 Brae retained the accounting firm of Arthur Andersen to conduct a purchase review of AS & I. After a review of AS & I's books, the sale was closed at the end of March in 1983. After the closing. Coopers conducted an audit of AS & I, in consultation with Arthur Andersen, certifying the financial statements and finding a shortfall of $1.2 million in the warranted net worth. The Stock Purchase Agreement provided that any shortfall in net worth would be off-set against the purchase price. After further scrutiny of AS & I's books, Brae claimed additional shortfalls in net worth totalling nearly $4 million. All of this shortfall was allegedly attributable to errors in inventory computation, overvaluation of accounts receivable, and other "counting" errors affecting net worth.
 
 
 4
 To settle these conflicting claims Brae and the Shareholders, after two months of negotiations, executed a Release and Amendment to the Stock Purchase Agreement. The Shareholders paid Brae nearly $2.8 million as an off-set to the purchase price, and Brae released the Shareholders from further liability as to net worth. The Shareholders argue that the legal effect of the Release was to foreclose further litigation over net worth. The trial court agreed as a matter of law.
 
 The Release provided:
 
 5
 * * *
 
 
 6
 * * *
 
 RECITALS
 
 7
 2. The parties desire fully and freely to settle differences which have arisen with respect to certain representations and warranties of RELEASEES under the Stock Purchase Agreement and their indemnification obligations in connection therewith.
 
 AGREEMENT
 
 8
 IN CONSIDERATION OF RELEASEES' AGREEMENT to permit BRAE ... to set off $2,281,000 ... as satisfaction in full for certain claims for indemnity against payments otherwise due from BRAE to RELEASEES ... BRAE, notwithstanding anything in the Stock Purchase Agreement to the contrary ... releases and forever discharges RELEASEES, and each of them, their successors and assigns, from all claims, demands, indemnifications and causes of action that BRAE may now have or that might subsequently accrue to BRAE arising out of or connected with, directly or indirectly, any representations or warranties of RELEASEES contained in the Stock Purchase Agreement ... except those contained in Section 2 [representations and warranties concerning stock ownership].
 
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 This Release is freely and unconditionally executed by the parties after having fully satisfied themselves by review of all considerations and data relevant to such a release. In executing this Release they do not rely on any inducements, promises or representations not contained herein.
 
 
 12
 Several days after the Release had been signed Brae became aware of alleged accounting errors used by Coopers with the knowledge of the Shareholders. According to Brae, Coopers was valuing certain future residual interests not at their discounted present value but at their value in the future. This alleged improper methodology overvalued these future reversions and inflated AS & I's net worth by some $5 million. Brae alleges that this methodology was not in accord with Generally Accepted Accounting Principles and Generally Accepted Auditing Standards, contrary to Coopers' representations, and that the shareholders participated in Coopers' fraud.
 
 
 13
 Upon discovery of the methodology and its effect on AS & I's stated net worth, the CEO of Brae informed the Shareholders that Brae intended to sue Coopers. The CEO also told the Shareholders that they need not be concerned with the suit because the Release precluded litigation against them. After consulting counsel, Brae changed its position and sued the Shareholders as well as Coopers.
 
 
 14
 Formal discovery was limited to requests for admissions under Rule 36 filed by the Shareholders. Brae admitted each request, authenticating the Release and admitting that it did not rely on any inducements, promises or representations made by the Shareholders. Brae also admitted, in language tracking that of the Release, that its claims arose out of the representations and warranties in the Stock Purchase Agreement. AS & I informally produced documents in August of 1984, and after the Shareholders' motion for summary judgment was filed in September of 1984, Brae stipulated to stay formal discovery until the motion was decided. Brae refers in its memoranda in opposition to summary judgment to the need for discovery, but it never made a Fed.R.Civ.P. 56(f) motion.
 
 
 15
 The district judge granted the Shareholders' motion for summary judgment and denied Brae's post-judgment motion to amend or withdraw one of its admissions. This court has jurisdiction under 28 U.S.C. Sec. 1291.
 
 DISCUSSION
 
 16
 1. Was the appeal timely?
 
 
 17
 The district judge entered final judgment on February 13, 1985. The next day Brae filed a motion to vacate or stay the judgment pursuant to Fed.R.Civ.P. 59 and a motion to amend or withdraw an admission pursuant to Rule 36.
 
 
 18
 On March 12 Brae filed a Notice of Intention to Dismiss Action, as follows:
 
 
 19
 Plaintiffs hereby advise the Court of their intention to dismiss the Complaint filed against Defendant Coopers & Lybrand in this action.
 
 
 20
 It is Plaintiffs' intention not to dismiss until after the Court has determined pending motions, set for hearing on April 1, 1985.
 
 
 21
 The intention to dismiss will moot one of the pending motions, a Motion to Vacate or Stay a Final Judgment Order in favor of the Individual Defendants in this case.
 
 
 22
 At the hearing on April 1, the district judge denied the Rule 36 motion to amend the admission. Her order referred to the Motion to Vacate as "Having been withdrawn." After hearing argument on the period of appeal, the district judge set April 1 as the commencement of the appeal period. Brae filed its Notice of Appeal on April 12.
 
 
 23
 A timely Rule 59 motion will suspend the appeal period under Fed.R.App.P. 4(a)(4). The Shareholders argue that Brae "withdrew" and thus nullified its Rule 59 motion on March 12 when it filed its Notice of Intention to Dismiss. With Brae's Rule 59 motion thus nullified, the Shareholders argue that the appeal period was not suspended. The Shareholders buttress this argument by pointing to Rule 4(a)(4), which provides that "the time for appeal ... shall run from the entry of the order ... granting or denying ... such motion." The Shareholders contend that because the Rule 59 motion was withdrawn, no Rule 4(a)(4) order was issued, and therefore the appeals period was never suspended by this short-lived Rule 59 motion.
 
 
 24
 We reject the argument. The Notice of Intention to Dismiss did not withdraw the Rule 59 motion. The Notice, expressing Brae's litigation plan, has no legal effect beyond expressing Brae's intent to keep the motion alive until the April 1st hearing. Furthermore, an order was issued disposing of the Rule 59 motion. The district judge referred to the motion and declared that it had been withdrawn. The date of its withdrawal was April 1, not March 12. The withdrawal operated as a concession of defeat by Brae, and the order disposed of it along with the Rule 36 motion. The district judge did not err in recognizing that the time for appeal began to run on April 1. Brae's April 12 Notice of Appeal was timely.
 
 
 25
 2. Should the district court have allowed discovery to Brae before summary judgment?
 
 
 26
 We review a denial of discovery for abuse of discretion. Foster v. Arcata Associates, Inc., 772 F.2d 1453, 1467 (9th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986).
 
 
 27
 Brae complains that several factual issues, such as the intent behind the Release and the Shareholders' role in the challenged accounting methodology, require discovery. Brae complains that it postponed discovery in reliance on the Shareholders' assurances that they were not responsible for the alleged accounting fraud. After Brae discovered the Shareholders' role, so Brae argues, it diligently pursued discovery through its Memoranda in Opposition to Summary Judgment, its Declarations in Opposition to Summary Judgment, its oral argument, and its post-judgment motions.
 
 
 28
 The district judge never formally denied discovery, because Brae never formally moved for discovery. References in memoranda and declarations to a need for discovery do not qualify as motions under Rule 56(f). Rule 56(f) requires affidavits setting forth the particular facts expected from the movant's discovery. Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment. Foster, 772 F.2d at 1467.
 
 
 29
 Further, the movant cannot complain if it fails to pursue discovery diligently before summary judgment. Frederick S. Wyle, P.C. v. Texaco, Inc., 764 F.2d 604, 612 (9th Cir.1985). Brae obtained the documents that it claims reveal the Shareholders' complicity in the accounting fraud on August 9, 1985. Yet it took no discovery before the summary judgment hearing on December 10, 1985 and in fact stipulated on October 24, 1985 not to take any discovery of the Shareholders before disposition of the motion. Brae possessed the relevant documents on August 9 and knew of the Shareholders' motion for summary judgment on August 28. Having taken no discovery, Brae "can hardly argue at this late date that the district court abused its discretion in ruling on the summary judgment in light of the fact that [Brae] itself failed to pursue the procedural remedy which the Federal Rules so clearly provided." Frederick S. Wyle, P.C., 764 F.2d at 612, quoting British Airways Bd. v. Boeing Co., 585 F.2d 946, 954 (9th Cir.1978), cert. denied, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241, reh'g. denied, 441 U.S. 968, 99 S.Ct. 2420, 60 L.Ed.2d 1074 (1979).
 
 
 30
 3. Does the Release bar this claim?
 
 
 31
 A. Interpretation of the Release.
 
 
 32
 We review the grant or denial of summary judgment de novo, Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986); because the Release specifies California law as governing, we must interpret the Release according to principles of California contract law.
 
 
 33
 Under California law, courts look to the meaning of the words used in a contract to determine the objective intent expressed through those words. Mission Valley East, Inc. v. County of Kern, 120 Cal.App.3d 89, 98, 174 Cal.Rptr. 300, 305 (1981); 1 Witkin, Summary of California Law, Contracts, Sec. 522. The court may consider the nature and object of the contract, as well as the preliminary negotiations and the circumstances under which it was made. Western Camps v. Riverway Ranch Enterprises, 70 Cal.App.3d 714, 724, 138 Cal.Rptr. 918, 923 (1977) (and cases cited therein). Only if the language is ambiguous or is used to conceal rather than express the true intent of the parties will the court pierce the objective form of the contract to the underlying intent. See California Civil Code Sec. 1649 (West 1985); Witkin at Sec. 522. The court may construe the contract practically by referring to acts of the parties subsequent to the execution of the contract and before a controversy has arisen as to its effect. Spott Electrical Co. v. Industrial Indemnity Co., 30 Cal.App.3d 797, 809, 106 Cal.Rptr. 710, 717-18 (1973).
 
 
 34
 We reject Brae's argument that the Release did not cover this claim and that the ambiguity of the Release requires a factual determination of the parties' intent.
 
 
 35
 This claim was "unknown" only in that Brae was unaware of the precise facts and dollar amount arising from the alleged accounting method. It was not "unknown" in the sense that neither party could have predicted or discovered a problem with net worth. The precise amount of the shortfall was unknown, but the fact that claims as to net worth were in dispute was known and contemplated.
 
 
 36
 Further, Brae's argument that the Release does not cover unknown claims, however defined, is contradicted by the language of the Release. It refers to claims that Brae may "now have or that might subsequently accrue ...." Brae argues that the mention of "certain" claims and "certain" representations and warranties conflicts with the Release's operative terms which reach all claims rather than "certain" or particular claims. The language is not ambiguous as Brae claims; it acknowledges only the uncertainty of the specific sums covered by the Release. The conflicts over "certain" claims as to net worth led the parties to settle those conflicts via the Release and the payment. In the bargained-for exchange, the Shareholders gave up nearly $2.3 million; Brae gave up the right to sue on claims as to net worth. This is unequivocally expressed in the Release.
 
 
 37
 The conclusion that the Release unambiguously settled all future net worth claims is supported by Brae's Rule 36 admissions and by its conduct after discovery of the alleged accounting errors. Brae admitted 1) that its claims arose out of and were directly connected with the representations and warranties made by the Shareholders in the Stock Purchase Agreement, 2) that the Release was binding and enforceable, and 3) that, in executing the release, it did not rely on any inducements or representations made by the Shareholders.
 
 
 38
 That Brae regarded the Release as precluding litigation against the Shareholders is revealed by Brae's CEO's statement to a shareholder to that effect. After Brae discovered the alleged accounting error, the CEO of Brae told a shareholder of AS & I that Brae would sue only Coopers because the Release precluded litigation against the Shareholders. Brae does not deny this. The language of the negotiated Release, the admissions by Brae, and the post-execution conduct by Brae all show that the parties expressed their intent to bar all claims as to net worth. Because we interpret the Release as an unambiguous release of claims as to net worth, we need not address the questions of mistake or interpretation of the Release against the drafter.
 
 
 39
 B. Is the Release invalid as to this claim under California Civil Code Sec. 1542?
 
 
 40
 California Civil Code Sec. 1542 (West 1982) provides:
 
 
 41
 A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.
 
 
 42
 Brae argues that Sec. 1542 invalidates the Release as to the claims arising from the accounting methodology. The district court held, and the Shareholders argue, that the Release is not a "general" release within Sec. 1542 but is a specific release relating to specific claims. Brae argues that this is a general release, relying on cases which define general releases as ones which purport to extend to unknown claims.
 
 
 43
 Brae argues here that the Release is invalid under Sec. 1542 as a broadly written general release which attempts to cover unknown claims. This contradicts its earlier argument that the Release covers only counting errors and not the unknown accounting methodology.
 
 
 44
 The Release is specific in that it stemmed from a specific section of the Stock Purchase Agreement and was written to cover the claims arising from that section (on representations as to net worth). The Release is general only in the sense that it waived all future (and hence unknown) claims as to the specific issue of net worth. We decline Brae's invitation to apply the rationale of the personal injury cases to this commercial context, and Brae cites us to no commercial case which applies Sec. 1542 to a release so specific as the one in dispute. Fisher v. Pennsylvania Life Co., 69 Cal.App.3d 506, 138 Cal.Rptr. 181 (1977), is inapposite. The defendant in Fisher owed a fiduciary duty to the plaintiff. The court in Vega v. Western Employers Insurance Co., 170 Cal.App.3d 922, 216 Cal.Rptr. 592 (1985), held that the release was ambiguous, leaving factual issues as to intent for trial. Leaf v. City of San Mateo, 104 Cal.App.3d 398, 163 Cal.Rptr. 711 (1980), is distinguishable because the plaintiffs in that case were suing a separate and independent wrong-doer who had not been a party to the first suit or to the release which settled the first suit. Similarly, in Sime v. Malouf, 95 Cal.App.2d 82, 212 P.2d 946 (1949), the court held that a release which by its terms applied only to a joint venture did not apply to claims arising from a subsequent transaction. The release invalidated in Matter of Vehm Engineering Corp., 521 F.2d 186 (9th Cir.1975), was a general release ("we hereby release you from all claims ... from the beginning of the world to date") executed by parties of unequal bargaining power (not between "knowledgeable businessmen" as Brae misrepresents in its Reply Brief). None of these cases involves either facts or releases similar to those here. The Release under consideration is specifically directed to a single provision and one type of claim in a multifarious Stock Purchase Agreement.
 
 
 45
 C. Does fraud invalidate the Release?
 
 
 46
 Brae contends that the Shareholders' misrepresentations and intentional nondisclosures amount to fraud which vitiates the Release. Brae complains specifically about two nondisclosures, 1) the alleged non-compliance with Generally Accepted Accounting Principles and Generally Accepted Auditing Standards, and 2) the Shareholders' silence about key facts concerning AS & I's balance sheet.
 
 
 47
 The Release bars Brae from raising allegations about misrepresentations. Brae admitted unequivocally in the Release and in response to the Shareholders' request for admissions under Rule 36, filed after Brae had commenced suit, that it was not relying on any inducements, promises, or representations not contained therein. That resolves the issue. Fisher v. Pennsylvania Life Co., 69 Cal.App.3d 506, 512, 138 Cal.Rptr. 181, 184 (1972).
 
 
 48
 Brae's contention that the Shareholders' alleged intentional nondisclosure constituted a triable issue as to fraud, would be true if the Shareholders had a special duty to disclose. In Fisher, for example, the defendants were directors of a corporation and thus held to a fiduciary duty to the plaintiffs, minority shareholders in the same corporation. No such special relationship exists here. See Lingsch v. Savage, 213 Cal.App.2d 729, 737, 29 Cal.Rptr. 201, 204-05 (1963), cited with approval in Goodman v. Kennedy, 18 Cal.3d 335, 348, 134 Cal.Rptr. 375, 384, 556 P.2d 737, 746 (1976).
 
 
 49
 Brae had opportunity to discover the alleged accounting fraud: it conducted a pre-purchase review of AS & I, a post-purchase audit, and it has owned and controlled AS & I since March 1983. The Shareholders provided documents upon request until October of 1984 after the Shareholders had filed their motion for summary judgment. Brae declared in the Release that it signed it "after having fully satisfied [itself] by review of all considerations and data relevant to such a release." There is no triable issue of fraud based on misrepresentations or nondisclosures.
 
 
 50
 AFFIRMED.
 
 
 
 *
 The Honorable Judith N. Keep, United States District Judge for the Southern District of California, sitting by designation