[Civ. No. 10642. Third Dist. Dec. 12, 1963.]

GEORGE E. CARROLL et al., Plaintiffs and Appellants, v. MARILYN DUNGEY, as Executrix, etc., et al., Defendants and Respondents.

Mark M. Brawman for Plaintiffs and Appellants.

Samuel R. Friedman for Defendants and Respondents.

FRIEDMAN, J.—George E. Carroll and his wife, Anne D. Carroll, brought this action against H. H. Chapman and Katherine Chapman, his wife, to secure rescission of a contract for purchase of the Hornbrook Water Company and for damages. The lower court held for the Chapmans and the Carrolls have appealed. Marilyn Dungey, executrix of the estate of H. H. Chapman, deceased, has been substituted as a defendant and respondent in place of H. H. Chapman.

Plaintiffs' action for rescission was based on alleged fraudulent representation and concealment by the Chapmans in the following particulars: (1) that the water system consisted of all new pipe; (2) that the water company had in its possession, or under its control, an adequate water supply; (3) that there was a knowing, fraudulent concealment of an

outstanding superior water right to the waters of Rancheria Creek, the primary source of water.

Defendants in their answer alleged affirmatively: "That plaintiffs were also fully informed of the nature of the water rights, if any, as alleged in paragraph VII of plaintiffs' Complaint. That plaintiffs made independent investigation and viewed the premises on numerous occasions prior to purchasing the capital stock of the Hornbrook Water Company from defendants, and plaintiffs relied on their independent investigation and observation of the assets of said corporation."

The trial court found that those paragraphs of the plaintiff's complaint charging fraud and misrepresentation were untrue and that the allegations of the defendants' answer were true. Judgment was entered in favor of the defendants. Plaintiffs have appealed and have launched a vigorous attack upon the sufficiency of the evidence to support the findings and judgment.

H. H. Chapman owned all the stock of the Hornbrook Water Company, which served the unincorporated community of Hornbrook in Siskiyou County. The main source of water was Rancheria Creek. There were two supplementary sources: a well on the west bank of Cottonwood Creek with a pumpline to the company reservoir and a ditch which supplied water to the reservoir from Cottonwood Creek itself. The State Department of Public Health had conducted a sanitary survey of the company's facilities and in October 1958 issued a report stating in part: "The Cottonwood Creek water and the well water are subject to contamination and are unsafe for domestic use without treatment. Bacteriological samples collected at intervals during the past several years by the Bureau of Sanitary Engineering indicate the Cottonwood Creek water contains gross contamination."

In June 1959 Chapman published an advertisement in a Los Angeles newspaper offering the water company for sale. The advertisement stated that the company was "just the thing" for a middle-aged, retired man who had some other source of income. The Carrolls, who lived in Southern California, saw the advertisement and wrote a letter inquiring about the company. They received a letter dated June 20, 1959, signed by Mrs. Chapman on behalf of Mr. Chapman which read in part: "There are 65 customers—all metered—1.50 per month for 600 cubic feet—all new steel pipe (new two years ago). Full price $7000 cash—Originally capitalized

at $12000—offered for sale two years ago at 3000 but since then have installed $4000 worth of new pipe." In July 1959 Mr. Chapman wrote to Mr. Carroll as follows: ". . . First, the $7,000 is very cheap considering all pipe lines, equipment etc. The company was capitalized at $12,000 years ago and a couple of years ago I offered it for $3,000 but since then I have put in $4,000 worth of steel line making the whole system steel as of now."

Thereafter, approximately in August or September, Carroll came to Hornbrook and Chapman took him around to observe the area and the waterworks. At that time there was no water in Rancheria Creek and the company's water was being drawn from the well by pumping. Chapman, Carroll testified, told him that the water supply was "adequate"; that water had to be pumped from the well in an emergency; that such an emergency had occurred only three or four times in 25 years. Nothing was said about health department reports or unfitness of any of the water for human consumption.

Mrs. Chapman also advised Carroll in writing that the water supply was "adequate."

On September 12, 1959, shortly after Carroll's return to Southern California, Chapman wrote him as follows: "You certainly had a first hand look at things at their very worst. As I told you this is the first time this has happened since 1924 and only the second in forty five years that I have known something about it."

Thereafter the Carrolls went to the Los Angeles office of the State Public Utilities Commission and examined copies of annual reports of the Hornbrook Water Company on file in that office. On November 8, 1959, Chapman wrote Carroll as follows: "My good old Rancheria gravity water has began [*sic*] to come down again and so I am thru pumping for this year I guess." Carroll made another trip to Hornbrook. The ditch bringing water into the reservoir was running full. Chapman took him up to a creek which he said was the source of the water then filling the reservoir. At that time Carroll did not know which creek was Rancheria Creek and which was Cottonwood Creek.

An agreement for purchase of the shares was executed in May 1960. During the summer of 1960 the Carrolls had to pump. In August 1960 Chapman brought to the Carrolls a box of miscellaneous papers belonging to the water company. The Carrolls examined the papers. Included in the box were several printed postcards which had been sent out by the

water company but returned to the sender by reason of non-delivery. These postcards revealed that in September 1955 the Hornbrook Water Company had notified its customers: "Sprinkling and irrigating must be stopped at once." In June 1959 a few months before Chapman published the advertisement which culminated in the sale to the Carrolls, he had notified his customers: "We are now using Cottonwood Creek water. It is advisable to boil drinking water."

Also included in the box was a 1904 deed to the Hornbrook Water Company conveying water rights in Rancheria Creek "below the ditch of S. W. Clary." The deed had been recorded in 1913. Another item in the box was a copy of the 1958 report of the State Department of Public Health revealing the contamination of Cottonwood Creek water and the well water.

In February 1961 Carroll noticed leakage in a field through which the water company pipeline ran. Digging down through the soil, he uncovered the buried pipeline. He discovered what he described as "old crumbled up rusty pipe." When he attempted to repair the leak by bolting metal shields around it, the entire pipe would crumble. The pipe section in question was underground and was about 800 feet long. Carroll's testimony indicated that he was unaware of the condition of this pipe when he bought the company. He stated that he would not have purchased the company had he been aware of this condition.

At some unspecified time after the purchase Rancheria Creek stopped running. Carroll made inquiries of Chapman, who told him that there was a prior water right upstream whose owner was using the water. (Inferentially, it appears that the upper owner was the successor of S. W. Clary, whose upstream ditch had been mentioned in the 1904 deed.) Carroll testified that he then made inquiries which revealed that the upper owner diverted Rancheria Creek for irrigating every summer. The water company would then be relegated to its secondary sources of supply, Cottonwood Creek and the well located near its bank. Carroll, however, was unaware of the health department report declaring that the latter two sources were contaminated.

Carroll denied prior knowledge of the superior water right. In his deposition, however, Chapman testified that on the occasion of Carroll's November 1959 visit he had told Carroll of that water right.

As to the stream which Chapman showed him in full flow

in November 1959, Carroll later discovered that Chapman had brought him to Cottonwood Creek (contaminated) and not Rancheria Creek. He testified that Chapman's November 8 letter mentioning "good old Rancheria gravity water" had led him to believe that the stream then filling the company reservoir was Rancheria Creek, not Cottonwood Creek.

In September 1961 the Carrolls gave Chapman notice of rescission. Additional facts will be stated in the course of the opinion.

Under familiar rules this court is bound by trial court findings which have substantial support in the evidence. ▄ The concept which must pervade our decision is stated in *Beck* v. *Weather-Vane Corp.*, 185 Cal.App.2d 688, 693 [8 Cal.Rptr. 680] : "The law is clear that in a fraud action the plaintiff must establish his case by clear and convincing evidence. (*Maslow* v. *Maslow*, 117 Cal.App.2d 237, 242 [255 P.2d 65].) ▄ It is equally well settled that the credibility of the witnesses, the weight that should be given to their testimony, and the inferences reasonably to be drawn therefrom, are for the determination of the trial court. (*Dillard* v. *McKnight*, 34 Cal.2d 209, 223 [209 P.2d 387].) ▄ In this connection it should be pointed out that the trial judge may reject the uncontradicted testimony of a witness provided he does not act arbitrarily. (*Hicks* v. *Reis*, 21 Cal.2d 654, 659-660 [134 P.2d 788].) 'Relevant in this respect are many considerations: interest of the witness in the result of the case, his motive, the manner in which he testified, and the contradictions appearing in the evidence.' (*Kraut* v. *Cornell*, 175 Cal.App.2d 528, 532 [346 P.2d 438].) ''

▄ Plaintiffs first attack the finding negativing the representation that the water company lines consisted of new steel pipe. Carroll testified, and Chapman denied, oral statements that the pipes were all new steel. The record is devoid of any denial that Mrs. Chapman wrote the letter of June 20, 1959 stating "... all new steel pipe (new two years ago)." In her deposition (admitted in evidence) she testified that the information in the letter had been given her by her husband. This letter coupled the reference to "all new steel pipe" with the statement that the owners had installed $4,000 worth of new pipe. These statements were followed by Chapman's July 27 letter stating: "... A couple of years ago I offered it for $3,000 but since then I have put in $4,000 worth of steel line making the whole system steel as of now." The unavoidable cumulative impression left by these

two letters is that within the last "couple of years" Chapman had spent $4,000 to make the system "all new steel pipe."

Apart from any other negotiations, representations or discoveries, such would be the unavoidable and inevitable message communicated by these two letters. An engineer might have wished to calculate the total pipe footage, might have suspected that $4,000 would be quite inadequate to replace the entire pipe system. There is no evidence that Carroll had any technical knowledge of these matters. The written utterances were plain and their impact on the reader plain— $4,000 spent two years ago to install new steel pipe throughout the system.

We have carefully examined the transcript of the oral testimony, the depositions of the four principals (all of which were admitted in evidence), and the documentary evidence. At no point did the Chapmans deny writing these letters. At no point did the Chapmans claim any inadvertence or innocent error in making these written statements. At no point did they testify as to any retraction or correction of these statements. Chapman admitted under oath that the system was not all new steel pipe, that the underground pipeline from the Rancheria access ditch was riveted steel pipe at least 25 years old. The untrue statement "all new steel pipe" is a palpable fact in evidence by means of written documents. It does not depend upon plaintiffs' testimony or the trial court's appraisal of their credibility. The record is bare of any evidence whatsoever to support the belief or create the inference that this misrepresentation had *not* been made. The lower court's finding that this misrepresentation had not been made is without any evidentiary support at all and is contrary to the evidence.

In justice to the learned and able trial judge, this finding was not the pivotal point of his decision. The record demonstrates that he was more concerned with the factor of reliance. ■ It is elementary of course that a misrepresentation does not constitute actionable fraud unless the plaintiff relied upon it; he cannot claim reliance if he makes an independent investigation, which, performed with reasonable diligence, should disclose the true facts. (2 Witkin, Summary of California Law, Torts, §§ 201-202.) ■ In a memorandum opinion commenting on the "all new steel pipe" representation, the trial judge stated (C.T., p. 28): "... even assuming that there was a misrepresentation, the plaintiff[s] had ample

opportunity to find out the facts by their inspection of the Public Utilities Commission records.'' In denying a new trial the trial court filed a brief opinion stating: ''Plaintiff relies heavily upon Exhibit 2 dated June 20, 1959. Obviously, if plaintiff were mislead [*sic*] by this letter, he had found out the true facts by October 16, 1959. (See Exhibit D) Inferentially, Exhibit D also shows that plaintiff was well aware that it was necessary to pump every year. Plaintiff's approach to this transaction was best described by the prophet Jeremiah, . . . 'None so blind as those that will not see.' ''

It is entirely correct that the Carrolls examined Hornbrook Water Company annual reports filed with the Public Utilities Commission. There are in evidence three of these reports, those for the calendar years 1957, 1958 and 1959. Exhibit D mentioned by the trial court, was a letter dated October 16, 1959, from Carroll to Chapman stating that he had reviewed annual reports submitted to the Public Utilities Commission and that ''In giving the footage, you said that all the lines were of steel; the report given [*sic*] 2400' as wood.''

Thus, in view of Carroll's independent investigation, he became charged with knowledge of whatever facts were revealed by the reports on file with the Public Utilities Commission when he visited that office in the fall of 1959. All these reports enumerated the footages of transmission and distribution pipe. The 1957 and 1958 reports described a system composed partly of standard screw pipe, partly riveted pipe and 2,400 feet of wood pipe. The 1959 report listed 2,400 feet of 4-inch ''spi-weld'' pipe instead of the wood pipe. Thus a reading of the 1959 report to the Public Utilities Commission would reveal a replacement of pipe. It might result in an inference (to someone who might draw that inference) that the new steel pipe did not involve the entire system but extended only to the 2,400 feet of wood pipe.

In fact, however, the 1959 report was not even in existence when the Carrolls visited the Public Utilities Commission in the autumn of 1959. The report states plainly that it is ''for the year ended December 31, 1959.'' Although the copy in evidence is undated, it was obviously prepared and filed sometime after December 31, 1959.

The fact that Carroll did not and could not have seen the 1959 report was not brought to our attention in any of the appeal briefs. The record does not show that this fact was ever brought to the attention of the trial court. ▮ An independent investigation does not preclude reliance where

the falsity of the statement is not apparent from an inspection. (*Bagdasarian* v. *Gragnon,* 31 Cal.2d 744, 748 [192 P.2d 935].) Carroll cannot be charged with knowledge of the partial, rather than entire, replacement of the pipe system inferable from the 1959 report, which was not in existence when he made his investigation.

That Carroll had some mental problem as a result of his examination of the 1957 and 1958 reports is shown by his letter of October 16, 1959, asking for an explanation of the report entry showing 2,400 feet of wood pipe. He may have been lulled to sleep by Chapman's reply of October 20, which stated: ''I am very glad that you asked some of the questions that you did. It brought me right up to the fact that I have been signing the reports each year as the accountants have made them out and sent them in without giving them any attention. Consequently I will have to ask you to beleive [*sic*] me on my word of honor that what I have told you is correct. . . . The 2400 foot of wood pipe was replaced with 4″ Spiweld in Nov. 1957, so that as I told you everything is steel.''

 The fact that some kind of investigation was made does not preclude reliance. (*Ferguson* v. *Koch,* 204 Cal. 342, 346 [268 P. 342, 58 A.L.R. 1176].) This rule is emphasized where the falsity of the statement is not apparent from the investigation or where the party is not competent to judge the facts without expert help. (*Bagdasarian* v. *Gragnon, supra,* 31 Cal.2d at p. 748.) There was at most, here, a theoretical possibility that Carroll might have drawn an inference that there was only a partial replacement of pipe. Such a theoretical possibility is not evidence. That Carroll's independent investigation of Public Utilities Commission reports led him or should have led him to recognize the falsity of the ''all new steel pipe'' statement rests on speculation, not proof. That he ultimately went through with the transaction might lead one to infer that he was telling the truth when he denied any such recognition. The dictum ''None so blind as those who will not see'' is not a rule of California fraud law. That law is designed to protect the ignorant and credulous no less than the well informed and analytical. The guiding concept is stated in *Seeger* v. *Odell,* 18 Cal.2d 409, 414-415 [115 P.2d 977, 136 A.L.R. 1291]: ''As a general rule negligence of the plaintiff is no defense to an intentional tort. (See Prosser, Torts, 402.) The fact that an investigation would have revealed the

falsity of the misrepresentation will not alone bar his recovery (Rest., Torts, § 540; see cases cited in 12 Cal.Jur. 758, 759), . . . Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man. Exceptionally gullible or ignorant people have been permitted to recover from defendants who took advantage of them in circumstances where persons of normal intelligence would not have been misled. (See cases cited in 6 Cal.Jur.Supp. 45 (note 13); Prosser, Torts, 749.) 'No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' (*Chamberlin* v. *Fuller*, 59 Vt. 247 [9 A. 832, 835].)''

 There is no evidence whatever that Carroll discovered the falsity of the misrepresentation ''all new steel pipe'' at any time before February 1961, months after he bought the water company. There is no evidence that in the course of his ''investigation'' Carroll had ever gone out with a shovel to dig for and inspect buried pipe. There is no evidence of any investigation on Carroll's part which demonstrated to him, or which confronted him with knowledge of, its falsity. Additionally, the record leads us to believe that the trial court may have regarded the 1959 Public Utilities Commission report as part of Carroll's investigation. In our opinion there was no evidence to support the finding that Carroll did not rely on the ''all new steel pipe'' misrepresentation.

 We turn now to the alleged misrepresentation of adequacy of the water supply. Since the representation was made in writing, the trial court's negative finding was apparently not intended to negative the representation, but only its falsity. The trial court also found lack of reliance.

Chapman had given Carroll the impression that pumping from the well was a rare necessity; that conditions in the summer of 1959 had occurred only once in 25 years. There was no denial of Carroll's testimony that Chapman had demonstrated the wrong creek to him. There was no attempt to explain Chapman's failure to acquaint Carroll with the fact that both secondary sources of supply, the well and Cottonwood Creek, were contaminated; nor the annual upstream diversion of Rancheria Creek which necessitated resort each year to these contaminated secondary sources. In his deposition, Chapman continued to insist that with one exception in 25 years the water supply had been adequate. Yet he admitted sending to his customers postcard notices of water short-

age and that this event had occurred more than once both before and after 1955. All this evidence would have supported findings on this issue favorable to plaintiffs. Nevertheless, the fact that Carroll had examined the 1957 and 1958 Public Utilities Commission's report, both of which revealed expenditures for pumping, led the trial court to conclude that Carroll did not rely on this representation. "Adequacy" of water supply is an uncertain quantitative representation as to which opinions may differ. Thus the trial court's apparent belief that the representation was not false and that plaintiffs did not rely on it is not devoid of support. ▮ Our review ends with the appearance of substantial evidence, contradicted or uncontradicted, which will support the findings. (*Primm* v. *Primm*, 46 Cal.2d 690, 693 [299 P.2d 231].) We have no power to disturb this portion of the findings.

▮ Plaintiffs challenge the adverse finding as to fraudulent concealment of the superior water right on Rancheria Creek. The evidence is quite clear that the 1904 deed revealing an upstream ditch was not given to Carroll until after he had purchased the water company. Recordation of the deed did not give Carroll constructive notice of its contents. (*Seeger* v. *Odell, supra,* 18 Cal.2d at p. 415.) There was, however, a conflict between Carroll's testimony and that of Chapman. In his deposition Chapman stated that he had told Carroll of the superior water right. Chapman's credibility was for the trial court. His statement constitutes substantial evidence which sustains this finding on appeal.

Chapman's concealment of the 1958 health department report declaring contamination of both the water company's secondary sources of supply was apparently considered only in connection with the problem of adequacy of the water supply. Plaintiffs' counsel did not attempt, by amendment, to plead this concealment as an independent source of fraud.

▮ Plaintiffs attack the findings by pointing out that one paragraph of defendants' answer failed to deny specifically the allegations of fraud. The answer contained a denial which referred to numerous paragraphs of the complaint by number, but failed to include the paragraph number in which these particular allegations were located. It is apparent that this omission in the answer was an oversight. The plaintiffs' pretrial statement stated that plaintiffs charge defendants with fraud and that "the answer denies generally the allegations of the Complaint." Both parties went to trial on the assumption that the fraud allegations were contro-

verted, and plaintiffs' counsel made no contention in the trial court to the effect that the fraud allegations were not at issue. Under these circumstances we will not give any consideration to this argument.

The judgment is reversed and the cause remanded for a new trial.

Pierce, P. J., and Schottky, J., concurred.