**In re JOGERT, INC., etc., Debtor.**

**Betty MOORE; Hilton Beals; Kenneth L. Beals, Plaintiffs–Appellees,**

v.

**JOGERT, INC.; John W. Reid; Hasso G. Vahl, Defendants–Appellees,**

v.

**Robert J. CHAMBERLAIN, Appellant.**

**In re JOGERT, INC., etc., Debtor.**

**Betty MOORE; Hilton Beals; Kenneth L. Beals, Plaintiffs–Appellees,**

v.

**JOGERT, INC.; John W. Reid; Hasso G. Vahl, Defendants–Appellees,**

v.

**COLDWELL BANKER, Appellant.**

**Nos. 89–56251, 89–56252.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1991.

Decided Dec. 20, 1991.

Robert J. Chamberlain, pro se.

Brad R. Godshall, Latham & Watkins, Los Angeles, Cal., for appellant.

Stanley C. Immerman, Scheinman & Bell, and Max H. Rush, Sulmeyer, Kupetz, Baumann & Rothman, Los Angeles, Cal., for plaintiffs-appellees.

Philip W. Bartenetti, Dolores Cordell, Clark & Trevithick, Los Angeles, Cal., for defendants-appellees-appellants.

Before NELSON, O'SCANNLAIN and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Robert Chamberlain and Coldwell Banker appeal the bankruptcy court's award of damages for fraudulent misrepresentations made in connection with the purchase and sale of a lumber yard. They challenge the bankruptcy court's jurisdiction, the standard of review applied by the district court, and the bankruptcy court's finding of reasonable reliance. We have jurisdiction under 28 U.S.C. § 158(d), and we affirm.

I

Facts and Proceedings Below

This dispute arose from a transaction in which Jogert, Inc. ("Jogert") acquired all the outstanding stock of Dietel Lumber Company, Inc. ("Dietel") from Elizabeth Moore, Hilton Beals, and Kenneth Beals, Dietel's three shareholders (collectively, the "Seller"). Robert Chamberlain, a real estate broker with Coldwell Banker ("Coldwell"),[1] acted as the Seller's broker and advised both sides throughout the negotiation sessions.

When the sale closed after lengthy negotiations, Jogert's principals, John Reid and Hasso Vahl (collectively, the "Buyer"), who had guaranteed Jogert's performance under the stock purchase agreement, were unhappy with what they received. They tendered a notice of rescission, alleging that the Seller and Chamberlain had misrepresented Dietel's financial condition. The Seller filed suit in state court against the Buyer, alleging breach of contract and fraud. The Buyer cross-complained against the Seller, Chamberlain, and Coldwell for fraud and breach of fiduciary duty. Coldwell and Chamberlain cross-complained for indemnification against Dietel, the Buyer, and the Buyer's broker.

After a period of hotly contested litigation, Jogert filed for relief under the Bankruptcy Code, and the state court action was removed to the bankruptcy court. Eventually, in response to the Seller's attempt to obtain relief from the automatic stay to foreclose on the Dietel stock, the Buyer agreed to return the shares to the Seller and to relinquish physical possession of Dietel. The Buyer and the Seller also stipulated to a bench trial of the main action in the bankruptcy court.

Prior to trial, the Buyer and the Seller settled their actions against one another and decided to proceed jointly against Coldwell and Chamberlain. Pursuant to the settlement agreement, the Buyer agreed to share with the Seller a portion of any recovery received from Coldwell and Chamberlain. Needless to say, Coldwell and Chamberlain were displeased with this development, which they regarded as surprising and unfortunate. They moved for a continuance, and also moved to dismiss the action on jurisdictional grounds. The bankruptcy court denied both motions, and the district court affirmed.

---

1. At the time, Chamberlain worked for Forest E. Olson, Inc. ("Olson"). Coldwell Banker, the appellant herein, is the successor in interest to Olson. For the sake of clarity, we will refer to both Olson and Coldwell as "Coldwell." Also, although Coldwell and Chamberlain appeal separately, we will sometimes refer to them collectively as "Coldwell."

After trial, the bankruptcy court held: (1) "As a direct and proximate result of the conduct of Chamberlain and [Coldwell] ... [the] Seller[ ] ha[s] suffered damage," (2) The Seller is "entitled to recover ... commissions [it] paid to Chamberlain and [Coldwell]," and (3) The Seller is "entitled to recover as damages ... the cost of the third party litigation between [the] Seller ... and [the Buyer]...." The district court affirmed each of these findings. Coldwell and Chamberlain now appeal.

## II

### The Bankruptcy Court's Jurisdiction and the District Court's Standard of Review

■ As a threshold matter, Coldwell argues that, pursuant to *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion), the bankruptcy court lacked jurisdiction to hear this case. Further, Coldwell argues that the district court erroneously reviewed the bankruptcy court's factual findings for clear error.

"The existence of subject matter jurisdiction is a question of law reviewed de novo." *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 779 (9th Cir.1991). Whether the district court applied the proper standard of review to the bankruptcy court's factual findings is also a question of law and, as such, is reviewed de novo.

## A

### The Marathon Decision

In *Marathon Pipe Line*, a plurality of the Supreme Court held that "the broad grant of jurisdiction to the bankruptcy

courts" contained in the Bankruptcy Act of 1978 [2] was unconstitutional:

> We conclude that [28 U.S.C. § 1471], as added by 241(a) of the Bankruptcy Act of 1978, has impermissibly removed most, if not all, of "the essential attributes of the judicial power" from the Art. III district court, and has vested those attributes in a non-Art. III adjunct. Such a grant of jurisdiction cannot be sustained as an exercise of Congress' power to create adjuncts to Art. III courts.

458 U.S. 50, 87, 102 S.Ct. 2858, 2880 (plurality opinion).[3] "This circuit has interpreted *Marathon* as depriving the bankruptcy court of jurisdiction 'to make final determinations in matters that could have been brought in a district court or a state court.' ... However, if the district court ... review[s] de novo, giving no deference to findings of the bankruptcy judge, initial proceedings can be held before a non-Article III court." *Piombo Corp. v. Castlerock Properties (In re Castlerock Properties)*, 781 F.2d 159, 162 (9th Cir.1986) (quoting *In re Thomas*, 765 F.2d 926, 929 (9th Cir.1985)).

In 1984, Congress amended the Bankruptcy Code in response to *Marathon.* The new structure is based upon the distinction between core and noncore bankruptcy matters:

> In noncore matters, the bankruptcy court acts as an adjunct to the district court, in a fashion similar to that of a magistrate or special master. In noncore matters, the bankruptcy court may not enter final judgments without the consent of the parties, and its findings of fact and conclusions of law in noncore matters are subject to de novo review by the district court.... In contrast to the bankruptcy court's authority in noncore cases, the

---

**2.** Pub.L. 95–598, § 241(a), 92 Stat. 2549, 2668–69 (codified at 28 U.S.C. § 1471(c)) (repealed 1984).

**3.** Specifically, section 1471(c) "gave the bankruptcy courts original and exclusive jurisdiction over all cases under title 11, and original jurisdiction of all cases arising in or related to cases under title 11." *Plastiras v. Idell (In re Sequoia Auto Brokers)*, 827 F.2d 1281, 1287 n. 9 (9th

Cir.1987). "The [*Marathon*] Court held that by granting article I bankruptcy courts authority to adjudicate state-created rights, as distinguished from federally created 'public rights,' Congress had encroached on the authority the Constitution reserved to article III courts and thus threatened the independence of the judiciary, and the separation of powers." *Id.* 827 F.2d at 1287–88.

bankruptcy court may enter final judgments in so-called core cases, which are appealable to the district court. The standard for appeal of core matters of the district court is the same as in other civil matters appealed from the district court to the circuit courts of appeal. 28 U.S.C. § 158(c).

*Castlerock Properties*, 781 F.2d at 161, quoted in *Taxel v. Electronic Sports Research (In re Cinematronics)*, 916 F.2d 1444, 1449 (9th Cir.1990).

The parties agree that this case constitutes a noncore related proceeding that normally would be affected by *Marathon*. Moreover, this circuit has recently held:

> [S]tate law contract claims, which did not fall within one of the enumerated core proceedings in 28 U.S.C. 157(b)(2)(B)–(N), are not core claims.... [E]ven if the state law claims could arguably fall within the language of section 157(b)(2)(A) or (O), one of two broadly worded, catch-all provisions of the section, such claims should still not be deemed core.... In reaching this conclusion, we emphasized that courts "should avoid characterizing a proceeding as 'core' if to do so would raise constitutional problems."

*Cinematronics*, 916 F.2d at 1450 (citations omitted). Therefore, as Coldwell points out, "[t]he Bankruptcy Court unquestionably would have had no jurisdiction to take these actions if this case had been tried post-*Marathon*."

**B**

**Marathon's Prospective–Only Effect**

The *Marathon* holding applies only prospectively. The Court noted:

> It is plain that Congress' broad grant of judicial power to non-Art. III bankruptcy judges presents an unprecedented question of interpretation of Art. III. It is equally plain that retroactive application would not further the operation of our holding, and would surely visit substantial injustice and hardship upon those litigants who relied upon the Act's vesting of jurisdiction in the bankruptcy courts. We hold, therefore, that our de-

cision today shall apply only prospectively.

*Marathon*, 458 U.S. at 88, 102 S.Ct. at 2880 (plurality opinion) (footnote omitted). Further, "the date that the decision in *Marathon* was to take effect was stayed by the Supreme Court until December 24, 1982, and the majority limited its holding to apply only [after that date]." *Equitable Factors Co. v. Wallen (In re Wallen)*, 34 B.R. 785, 787 (Bankr. 9th Cir.1983), *aff'd mem.* 742 F.2d 1461 (9th Cir.1984).

This case was decided by the bankruptcy court on April 19, 1982—before the announcement of the *Marathon* decision. Technically, therefore, the *Marathon* holding does not apply. As we stated in *Klapp v. Landsman (In re Klapp)*, 706 F.2d 998, 999 n. 1 (9th Cir.1983),

> [i]f the stay of the *Marathon* decision is to have any effect, it must limit the prospective effect of the substantive *Marathon* holding to decisions made after the termination of the stay. Thus, even assuming that the exercise of judicial power by the bankruptcy court and BAP here is otherwise unconstitutional under the principles set forth in *Marathon*, since *Marathon* is not to have retroactive effect, the BAP decision is a valid judgment over which this court has jurisdiction under the Act.

(citations omitted). In *Klapp*, the decisions of both the bankruptcy court and the BAP were entered before *Marathon*'s effective date, and the *Marathon* holding did not apply to either. *Id.; see also Lucas v. Thomas (In re Thomas)*, 765 F.2d 926, 928 (9th Cir.1985) (we "judge the validity of the bankruptcy court's judgment ... under the standards of the Bankruptcy Reform Act of 1978"); *Christison v. Norm Ross Co. (In re Eastview Estates II)*, 713 F.2d 443, 447 (9th Cir.1983) (same).

Similarly, other circuits have held that all bankruptcy court judgments entered before *Marathon*'s effective date are valid judgments. *See Commonwealth of Massachusetts v. Dartmouth House Nursing Home*, 726 F.2d 26, 30 (1st Cir.1984) ("prospective application of *Marathon* ... contemplate[s] full rights to appellate review from all final

judgments ... entered by bankruptcy courts prior to the expiration of the stay"); *Gray v. Snyder*, 704 F.2d 709, 711 (4th Cir.1983). In *Gray*, 704 F.2d at 711, the Fourth Circuit held:

> Based upon [*Marathon*], appellant contends that the bankruptcy court could not constitutionally exercise jurisdiction over this case. If this argument were to prevail, the effect would be to nullify the entire course of proceedings to date, necessitating remand to the district court for reconsideration of both the legal and factual issues decided by the bankruptcy court. Because of the prospective-only effect of the [*Marathon*] decision, the argument must fail.

In *Rhodes v. Stewart*, 705 F.2d 159, 160–61 (6th Cir.), *cert. denied*, 464 U.S. 983, 104 S.Ct. 427, 78 L.Ed.2d 361 (1983), the Sixth Circuit held that "[p]rospective application of [*Marathon*] mandates, at a minimum, that all bankruptcy court entries of judgment prior to June 28, 1982 ... are to be afforded de facto validity." (footnote omitted). The court declined to consider the effect of judgments entered between June 28—the date of the *Marathon* decision—and December 24—the date the stay of execution expired—but noted that "[a]lmost all bankruptcy courts confronting this issue have concluded that the jurisdictional proscriptions of [*Marathon*] did not attach until the stay of execution of judgment expired or was dissolved." *Id.* 705 F.2d at 161 n. 1. Informed by the reasoning of the above cases, we agree that all bankruptcy judgments that became final before December 24, 1982 are valid and not affected by *Marathon*'s jurisdictional limitations.

■ Even if we conclude that *Marathon* does not apply to the bankruptcy court's judgment, Coldwell argues, the circumstances of this case would allow Coldwell to fit within a narrow exception to the general rule. Coldwell asserts that *Marathon* should apply retroactively in this case because Coldwell "challenged the subject

matter jurisdiction of the bankruptcy court at trial." To support this proposition, Coldwell cites cases in which *Marathon* was applied retroactively because the defendant had objected to the bankruptcy court's jurisdiction at trial. In each of these cases, however, there was a specific objection that "28 U.S.C. § 1471(b) and (c) are unconstitutional delegations of Article III authorization to an Article I court and constitute an unconstitutional deprivation of due process as applied in this case." *Wyandotte Indus. v. Morton Machine Works (In re First Hartford Corp.)*, 25 B.R. 234, 235 (Bankr.S.D.N.Y.1982); *see also Meeker v. Livengood Real Estate Co. (In re Meeker)*, 22 B.R. 745, 746 (S.D.Ohio 1982) (defendant objected that bankruptcy court "was an unconstitutionally created court ... having been given broad general jurisdiction and broad judicial powers, but with the judges being neither tenured nor with guaranteed income").

In contrast, Coldwell's objection to subject matter jurisdiction stated:

> The [bankruptcy court] no longer has subject matter jurisdiction over the lawsuit. The remaining proceedings should be remanded to State Court since the claim of the debtor no longer concerns an asset or liability of the debtor but rather a civil fraud action which should be tried pursuant to State Law.

Because Coldwell's jurisdictional objection contained no *Marathon*-style constitutional challenge, we conclude that *Marathon* does not apply retroactively in this case. The district court was therefore correct in concluding that jurisdiction was proper in the bankruptcy court.[4]

## C

### Standard of Review

■ Coldwell claims further that the district court erred in failing to review the bankruptcy court's findings of fact de novo. The district court held that "it must

---

4. Coldwell also claims that "[d]ismissal based on [its] pre-*Marathon* objection is consistent with Ninth Circuit jurisdictional principles." It argues that, "in reviewing jurisdictional issues on appeal, it applies the rules in effect *at the* *time of appeal*, not the possibly superseded rules in effect when a case went to trial." True enough, but *Marathon*'s "prospective-only" application specifically requires us to apply the law in effect before that decision.

treat the judgment of the Bankruptcy Court as it would be treated under the 1978 Act, which means that the findings of fact of the Bankruptcy Court are reviewed under the 'clearly erroneous' standard. Holdings of law, of course, are reviewed *de novo*." We agree with the district court.

As a general matter, "we ... apply the law as it exists when we render our decision." *Rubin v. Belo Broadcasting Corp. (In re Rubin)*, 769 F.2d 611, 614 (9th Cir. 1985). To support the proposition that the district court should have applied a de novo standard, Coldwell cites *Rosner v. Worcester (In re Worcester)*, 811 F.2d 1224, 1229 (9th Cir.1987), and *Castlerock*, 781 F.2d at 161–62. As Jogert correctly points out, however, "[b]oth of the cases cited involved review of bankruptcy court decisions [entered] *after* the *Marathon* cutoff date of December 24, 1982." These cases are not relevant, then, because in this case the bankruptcy court's decision was entered before the operative date and is therefore outside the scope of *Marathon.*

The interesting point here is that the district court heard this appeal in 1989. The rule in effect at that time—the 1984 Bankruptcy Act—mandated de novo review of bankruptcy court determinations in related proceedings. Coldwell argues that the district court was required to apply the standard of review in effect *while the appeal was pending. See Worcester*, 811 F.2d. at n. 3. We do not agree.

Our holding today is that bankruptcy court judgments entered prior to the effective date of *Marathon* are valid judgments *for all purposes.* The only way to make sense of *Marathon*'s prospective-only application is to conclude that the Supreme Court's jurisdictional mandate is to have *no effect* prior to December 24, 1982. This view squares with the case law. In the past we have—without deciding or discussing the issue—reviewed factual findings for clear error in a case decided by the bankruptcy court pre-*Marathon* but pending on appeal post-*Marathon. Tri–State Livestock Credit Corp. v. Ellsworth (In re Ellsworth)*, 722 F.2d 1448, 1450 (9th Cir. 1984). Further, although the *Worcester*

court noted that the Emergency Rules "governed any bankruptcy proceedings pending from December 25, 1982 to July 10, 1984," the court was driven by the fact that the case "clearly [fell] under the Emergency Rule [calling for de novo review] because the Bankruptcy Court's judgment ... was entered after December 25, 1982." *Worcester*, 811 F.2d at 1229 n. 3, n. 4.

Here, again, the bankruptcy court's judgment was entered before the stay terminated, and we hold that the judgment should be treated as "final" for all purposes, including the district court's standard of review. The district court was therefore correct in applying the clearly erroneous standard to the bankruptcy court's factual findings.

■ Coldwell also argues that the district court erroneously treated the bankruptcy court's findings of fraud and justifiable reliance as questions of fact subject to clearly erroneous review. Coldwell believes that these issues are "mixed questions of law and fact," which the district court should have reviewed de novo. Again, we disagree.

To establish actual fraud under California law, the plaintiff must show that the defendant, with intent to deceive or induce the plaintiff to enter into a contract, (1) misrepresented a material fact, (2) suppressed facts it knew or believed to be true, or (3) made a promise intending not to perform it.

*Miller v. Fairchild Indus.*, 876 F.2d 718, 728 (9th Cir.), *amended* 885 F.2d 498 (9th Cir.1989), *cert. denied*, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990). Stated differently, "a fraud action requires (1) misrepresentation; (2) knowledge of the falsity of the representation; (3) intent to induce reliance; (4) justifiable reliance; and (5) damages." *Stewart v. Ragland*, 934 F.2d 1033, 1043 (9th Cir.1991). As we observed in *Miller*, "[a]ctual fraud is a question of fact involving determinations of intent and evaluations of credibility properly resolved by the jury." *Miller*, 876 F.2d at 729. Accordingly, the district court was correct in considering the bankruptcy

court's findings of fraud and reasonable reliance under the clearly erroneous standard.

## III

### Reasonable Reliance

■ Coldwell next argues that there is insufficient evidence to sustain the bankruptcy court's finding that "Reid and Vahl relied on the representations of Chamberlain in authorizing the purchase of Dietel by Jogert."

"We review independently the bankruptcy court's decision because we are in as good a position as the district court to review the bankruptcy court's findings." *Wright v. Holm (In re Holm),* 931 F.2d 620, 622 (9th Cir.1991). Because we concluded in section II(C) above that the district court's standard of review was not altered by *Marathon,* we, like the district court, "review the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law *de novo."* *Holm,* 931 F.2d at 622.

The bankruptcy court found that Chamberlain made five specific false representations regarding Dietel's financial condition. First, the court found that Chamberlain represented to the Buyer that Dietel made a net profit before taxes of approximately $600,000 in each of the years 1977, 1978, and 1979. In fact, Dietel earned profits of $73,000 in 1977, $167,000 in 1978, and $220,000 in 1979. Second, Chamberlain represented that Dietel's pre-tax profits were 17.8% of gross sales in 1979, when in fact they never exceeded 4% in any relevant year. Third, Chamberlain represented that Dietel could generate sufficient "cash flow" to service the debt incurred by the Buyer in connection with the purchase if Dietel's payment obligations were extended to between 60 and 90 days. In fact, Dietel had no such option. Fourth, Chamberlain represented that Dietel operated more efficiently than other lumberyards, when in fact the opposite was true. Fifth, Chamberlain represented that Dietel could generate sufficient cash flow to finance a purchase price between $1.7 million and $2 million. This was far from the case.

The bankruptcy court found that these representations were made "with the intention to induce Jogert, Reid and Vahl to rely thereon" and "with the intention of inducing Jogert to purchase all of the outstanding stock of Dietel." The court also found that "Jogert, Reid and Vahl ... relied upon said material misrepresentations of fact," and that their reliance was "reasonable and justifiable under the circumstances."

Coldwell does not now deny the specific misrepresentations. Rather, it argues that the record fails to support a finding of reasonable reliance for three reasons: (1) the Buyer cannot claim to have relied on representations of fact that were "directly contrary" to the specific and unambiguous terms of the written purchase agreement; (2) the Buyer had a duty to investigate the finances of its acquisition target, did in fact perform such an investigation with the assistance of experts, and is charged with the knowledge a reasonable investigation did or should have revealed; and (3) the Buyer cannot claim to have relied on any statements that were expressions of opinion or predictions about future events. Although these arguments may, under certain circumstances, carry significant weight, we do not think they create per se barriers to a finding of reasonable reliance. This case involves more than a simple failure to find the truth, or a mistaken reliance on predictions and opinions. Reid and Vahl were mesmerized by Chamberlain's fast-talking, authoritative approach. This being the case, we will not upset the bankruptcy court's well-grounded finding.

Coldwell relies on *Cohen v. Wedbush, Noble, Cooke, Inc.,* 841 F.2d 282, 288 (9th Cir.1988), and *Fisher v. Pennsylvania Life Co.,* 69 Cal.App.3d 506, 511, 138 Cal.Rptr. 181 (1977), for the proposition that the Buyer cannot claim it relied on Chamberlain's representations because contrary representations were included in the stock purchase agreement. In *Fisher,* the plaintiff claimed that he was induced to purchase securities from the defendants because of fraudulent statements made during the negotiation sessions. The written contract, however, contained a provision stating that

the plaintiff "entered into the ... agreement in reliance *only* on the representations set forth in that agreement." *Fisher,* 69 Cal.App.3d at 511, 138 Cal.Rptr. 181 (emphasis in original). The court rejected the fraud claim, holding that "since [the plaintiff] agreed that he had not relied on the representations on which he now seeks recovery, he cannot now claim otherwise." *Id.*

The plaintiffs in *Cohen* sought to escape an arbitration clause in a margin agreement with their brokerage firm. They claimed they were fraudulently induced to sign the agreement because they were told that nothing in the agreement would "compromise any of [their] rights." Under these circumstances, we held that the plaintiffs' "reliance on [the] alleged misrepresentation was unreasonable in light of the clear and explicit language of the contract." *Cohen,* 841 F.2d at 288. We noted in explanation:

> We see no unfairness in expecting parties to read contracts before they sign them. As the First Circuit stated in [*Turner v. Johnson & Johnson,* 809 F.2d 90, 96 (1st Cir.1986)], "if a jury is allowed to ignore contract provisions directly at odds with oral representations allegedly made during negotiations, the language of a contract simply would not matter anymore.... Contracts would become no more than presumptive statements of the parties' intentions, instead of legally enforceable agreements...."

*Id.* at 287–88.

Similarly, the Stock Acquisition Agreement here contained an integration clause, stating:

> This agreement and the schedules and exhibits specifically referred to herein ... represent the entire agreement of the parties hereto with respect to the subject matter hereof superseding all prior agreements, understandings, discussions, negotiations and commitments of any kind.

The agreement incorporated financial statements which directly contradict Chamberlain's alleged misrepresentations.

Under *Cohen* and *Fisher,* Coldwell would have us dismiss the fraud claim because the integration clause and incorporated financial statements would preclude any finding of reasonable reliance on Chamberlain's misrepresentations. Our reading of *Cohen* and *Fisher* is not so broad. The Stock Acquisition Agreement is a contract between the Buyer and the Seller—neither Coldwell nor Chamberlain are parties to it. The purpose of the disclaimer was to protect the Seller, not Coldwell, and Coldwell may not point to the disclaimer in defense of Chamberlain's fraudulent statements.

■ Coldwell also claims that because the Buyer conducted an independent investigation, with the assistance of experts, it cannot now claim to have relied on Chamberlain's representations. Again, Coldwell relies on *Cohen,* which held that "reliance on a misrepresentation is not reasonable when the plaintiff could have, through the exercise of reasonable diligence, ascertained the truth of the matter." *Cohen,* 841 F.2d at 287; *see also Carroll v. Dungey,* 223 Cal.App.2d 247, 254, 35 Cal.Rptr. 681 (1963) (plaintiffs "cannot claim reliance if [they] make an independent investigation, which, if performed with reasonable diligence, should disclose the true facts"). The *Cohen* court noted further that "[r]equiring reasonable investigation by the party claiming fraud is particularly appropriate in cases where, as here, the explicit language of the contract directly contradicts the alleged misrepresentation." 841 F.2d at 287.

We do not believe the *Cohen* holding is applicable to the facts of this case. True, the Buyer's investigation was extensive and conducted by a team of professionals—including an attorney, broker, financial advisor and an accountant—over a period of eight months. However, the record also indicates that Chamberlain continually told the Buyer that its own investigation was flawed because the books had been "mickey moused." Accordingly, Jogert's accountant, Phillip Rittenberg, was instructed to review Dietel's books only for "bookkeeping methods" and was not asked to verify either the net profit for the preced-

ing three years or Chamberlain's cash flow projections.

Furthermore, Chamberlain refused to provide Reid or Vahl with copies of Dietel's tax returns, on the ground that the information contained in them was "false." He continually held himself out as an "expert in financial matters" with "superior knowledge of Dietel's financial condition." He insisted to the Buyer that the lawyers and other advisors did not understand the company's condition and even advised Reid and Vahl to avoid seeking their experts' advice.

Thus, even if the Buyer's investigation was able to yield the truth, Chamberlain had enormous persuasive powers over them. In the words of the *Carroll* court:

> The fact that some kind of investigation is made does not preclude reliance.... The dictum "None so blind as those who will not see" is not a rule of California fraud law. That law is designed to protect the ignorant and credulous not less than the well informed and analytical.... The fact that an investigation would have revealed the falsity of the misrepresentations will not alone bar [a plaintiff's] recovery.... Nor is [a] plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man. Exceptionally gullible or ignorant people have been permitted to recover from defendants who took advantage of them in circumstances where persons of normal intelligence would not have been misled....

*Carroll,* 223 Cal.App.2d at 256–57, 35 Cal. Rptr. 681. We agree with the *Carroll* court that " '[n]o rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance [gullible].' " *Id.* at 257, 35 Cal.Rptr. 681 (citation omitted). In other words, as the bankruptcy court noted, "almost every fraud case involves a plaintiff who believed something that nobody on earth would have believed."

■ Coldwell also claims that certain of Chamberlain's representations were "non-actionable statements of opinion." "Fraudulent representation, to constitute a ground for relief, must be as to existing and mate-

rial facts; predictions as to future events are ordinarily non-actionable expressions of opinion." *Richard P. v. Vista Del Mar Child Care Serv.,* 106 Cal.App.3d 860, 864, 165 Cal.Rptr. 370 (1980). Further, as the California Court of Appeal noted long ago,

> As a general rule statements ... having relation to future earnings, expected profits or dividends, or the successful conduct of its business, are merely matters of opinion, on which the subscribers have no right to rely, and though they prove to have been false when made, or even to have been made with no expectation of their ever being realized, still they furnish no ground for rescinding the contract....

*Zeh v. Alameda County Hotel Corp.,* 122 Cal.App. 366, 368, 10 P.2d 190 (1932). Again, we conclude that this rule has no application in this particular case.

■ Although predictions as to future events cannot normally form the basis of a fraud action, California law carves out an exception to this rule "where a party holds himself out to be specially qualified and the other party is so situated that he may reasonably rely upon the former's superior knowledge." *Borba v. Thomas,* 70 Cal. App.3d 144, 152, 138 Cal.Rptr. 565 (1977). As we explained above, we conclude that Chamberlain did just that. We further conclude that the Reid and Vahl were particularly vulnerable to Chamberlain's insistence that all of the well-trained experts were misreading Dietel's financial picture, as he consistently reminded them that he was the only one who really knew the facts about Dietel.

Accordingly, on the issues addressed in this opinion, the district court's affirmance of the bankruptcy court is

AFFIRMED.[5]

---

**5.** Other issues raised on appeal and cross-appeal—some requiring remand—are disposed of

in a separate memorandum disposition filed     simultaneously with this opinion.